Kennon, J.
This case stands upon a bill of review filed June 16, 1848, and an amended and supplemental bill filed November V, 1848, in the Supreme Court of Montgomery county. -
The original case was a bill filed by Ludlow’s heirs v. Letitia C. Cooper and others, claiming title to land through Daniel C. Cooper.
The bill claimed that the ancestor of complainants owned the undivided half of a large quantity of land, lying in and about the town of Dayton; that the strict legal title being in Cooper, he had sold and conveyed a portion of the same in his lifetime; that the residue of the land was held in trust by the defendants for complainants. The bill prayed an account of the "proceeds of the lands sold, and a conveyance of a moiety of the land unsold.
Upon a final hearing of the case in the Supreme Court in bank, at the December term, 1843, the bill was dismissed.
The bill now filed claims that the court erred in dismissing the bill; that the decree should be reversed on that account; that since the final hearing the complainants have discovered new and material evidence, which would have changed the aspect of the case on the original hearing, and would have entitled the complainants to a decree.
The first question to be determined is, whether the court in bank, upon the evidence before it, should have rendered a decree for the complainants instead of dismissing the original bill. In determining this question, we have looked into all the evidence with care, in order to see whether the Supreme Court was justified, upon the facts of the ease, in making the final decree.
*To understand more clearly the case, it may be useful to state that the original bill avers, that some time prior to or about the year 1801, Daniel C. Cooper, late of Dayton, in Montgomery county, now deceased, purchased from the United States (including certain pre-emption rights of individuals) a large quantity of land, *4 near to and adjoining the present town of Dayton, amounting to more than three thousand acres, and being the same land referred to in the written agreement thereafter set forth. That shortly after making the said purchase, and before making any payments thereon, said Cooper entered into a verbal agreement with said Israel Ludlow, the substance of which was, that said Ludlow was to pay one-half of the purchase money and expenses, and be equally interested with the said Cooper in all the said lands, except certain tracts specified in the written agreement; that in pursuance of said verbal agreement, said Cooper and Ludlow proceeded to make improvements and dispose of lots by donation and sale, and to do ■divex-s other acts of ownership; in all of which said Ludlow parti•cipatod as joint proprietor with said Cooper, although the business was chiefly transacted by said Cooper, he having made the purchase •originally, axid residing at Dayton; that, petitioners are unable to state the exact amount of purchase money advanced by said Ludlow, but are informed and believe that he advanced more than his half, and thus brought the said Cooper largely indebted to him; that afterward Cooper and Ludlow entered into a written agreement, of which the following is a copy:
“Whereas, I, Daniel C. Cooper, of the town of Dayton, in the county of Montgomery, have purchased of the United States certain laxxds in the 7th range of townships, near to and including the town of Dayton, in the Miami Purchase, as may appear by the register’s and receiver’s office, and have also procured of the commissioners certain certificates of rights of pre-emption in the 7th and 8th ranges as aforesaid; now know ye, that I, the said Daniel C. •Cooper, for the consideration hereafter named, hath granted, bargained, and sold, and by these presents doth *grant, bargain, and sell, to Israel Ludlow, of Hamilton county, an equal moiety or half part of all said tracts purchased as aforesaid, or certificates taken as aforesaid, excepting and reserving the following tracts and town lots, viz: town lots Nos. 1, 2 and the fraction in front, 12, 63, •61, 65, and 66 ; also, all the lands east of Mill street, and north of them on the Main street, heading up Mad river, for the use of the mills; also, fractions No. 2, first town, and the east quarter of section No. 24, and fraction 23, and section 32, second town, and seventh range, and all the lots which settlers were entitled to by virtue of their first settlement.
“ The said Israel Ludlow, for the consideration of the aforesaid *5 grant, doth agree to pay one equal half part or moiety of the purchase money for the aforesaid tracts, purchased as aforesaid, excepting for the aforesaid excepted tracts. The said parties are to b'e-equal in all advances toward the purchase money, as also in the proceeds of sale of said lands or any part of them,” etc.
Signed by the parties and dated December 13,1803
It is further stated, that at the time of the contract a large part of the purchase money had been paid, partly from advances made-by Ludlow, and partly by proceeds of sales of lots, and that shoi’tly after the balance was paid by the proceeds of sales; but complainants can not state the dates or the amounts of the several payments.. That on January 24, 1804, Israel Ludlow died, leaving heix’s, James-C. Ludlow, Sarah Bella Ludlow, and Max’tha C. Ludlow, infants, the eldest not exceeding six years of age, and Israel L. Ludlow, boxm after his death. That after the death of Ludlow, Cooper procured patents for all the lands in his own name in severalty; and continued to make sales uxxtil in 1818, when he died testate, making Joseph H. Crane, Horatio G-. Phillips, and James Steel, his executors, and devising his whole estate to his two sons, David Z. and Daxxiel C. Cooper. Daniel C. Cooper, the younger, afterward died intestate, leaving *his brother David Z. his sole hem at law. Subsequently, in 1837, David Z. died testate, making Alexander-Grimes and Edward ~W. Lewis his executors, and devising all his. estate to his wife, Letitia C. Cooper. - The executor of Daniel C. Cooper, the executors of David Z. Cooper, his widow Letitia C., and others, are made defendants.
Complainants further charge, that no part of the proceeds of the sale of said land, so far as the same was sold, were received by their ancestor during his life, nor by themselves since his death, nor has any part of the land been conveyed to him or them, nor-any account rendered. And they allege that they would long sineehave applied for relief, but they had no knowledge of the written agreement, the same having been mislaid or lost, a great length of time, and only discovered a few months before the commencement of the .suit, among the papers of their ancestor.
The defendants are called upon to answer under oath, and the-prayer of the bill is that the defendants may be decreed to pay such balance as may be found due on accounting, and to convey an undivided half of the lands left unsold.
After the bill was filed, and before the hearing, there was a *6 ■considerable change of parties, by death, intermarriage, and otherwise.
Several of the defendants disclaim, others answer;
Those who answer, deny from information and belief nearly every material allegation in the bib, except the execution of the written agreement, dated the 13th of December, 1803; and so far as that agreement is concerned, it 'is claimed that Ludlow died about a month after the execution of the contract, and that neither he, in his lifetime, nor his administrators or heirs after his death, paid anything on the contract; that the bill is to be considered as a bill for the specific performance of a contract; that the lapse of time bars all the equity of the complainants ; that they are barred by the statute of limitations, and that the ^contract was re■scinded by Cooper and the administrators of Ludlow.
The Supreme Court in bank found, from the facts in the case, that Ludlow did not, in his lifetime, advance any money on the first installment, nor did his representatives since his decease pay any money to Cooper on the contract; that the first payment on the land had been made by Cooper in 1801, before the contract in writing was entered into ; that the other payments became due on the successive last days of December, 1803, 1804, and 1805, but wore not made until 1813, to which time credits had been extended by successive acts of Congress; that Cooper continued to reside on the properly in Dayton, treating it as his own, after the death of Ludlow; that some intercourse occurred between him and the administrators of Ludlow, toward the settlement of his accounts with the estate of Ludlow ; and Lane, C. J., who delivered the opinion of the court, says; “ I can not resist the conviction that Cooper and the administrators settled this, with other claims, and that the latter relinquished, as far as they were able, the interest of the estate of Ludlow in this land.”
Without, however, reciting the facts found by the court, or the evidence upon which the court based their opinion (a full report of which is found in 13 Ohio, 552), we think the court was fully justified in finding the existence of a state of facts which authorized and .required the dismissal of the bill.
The written contract between Ludlow and Cooper shows very ■clearly what the parties intended. They intended to be equal partners in the property. 11 They were to be equal in all payments toward the purchase money, as also in the profits or proceeds of *7, 8 the sale of said lands, or any part thereof.” They were to pay equally, and share alike in the profits of the sales of the lands, or any part of them; and if no profits, then they were to be equal in, the proceeds of the sales.
It was from the amount of money received from the sales of the-land that they were to ascertain how much each was to receive.
*The parties to the contract contemplated a partnership, in the-purchase and sale of real estate; and from the location of Ludlow in Cincinnati, and Cooper in Dayton, the place at which the town-lots and lands were situated, it is, to say the least, not improbable-that the parties understood that the patents were to issue in the-name of Cooper. The whole transaction would suggest that as the-proper course to be pursued.
If we are right in our construction of this written instrument, it becomes very material to ascertain whether the property thus purchased is to be, in equity, considered real or personal property;. and this question is one not to be answered without difficulty, for it can not be said that the decisions on this question have been, entirely uniform.
JStory on Partnership, section 93, says: “ Indeed, so far as the partners and their'creditors are concerned, real estate belonging to the partnership is, in eqriity, treated as mere personalty, and governed by the general doctrine of the latter; and so it will be deemed in equity to all other intents and purposes, if the partners themselves have, by their agreement or otherwise, properly impressed upon it the character of personalty. But a question has-been made whether, in the absence of any agreement or other act affecting its general character, real estate held as part of the partnership funds-ought to descend to the heir, or belong to the executor or administrator upon the death of the partner.” And he proceeds to say that there is a diversity of judicial opinion as well-as judicial decision upon that point, and that the doctrine, under these circumstances, must be open to many distressing doubts.
Kent, who seems to have examined the authorities on this point with care, says: “ If partnership capital be invested in land for the-benefit of the company, thought it may be a joint tenancy at law, yet equity will hold it to be a tenancy in common, and as forming a part of the partnership fund; and the better opinion would seem to be, that equity will consider the person in whom *the legal *9 title is vested as trustee for the whole concern, and the property will be entitled to be distributed as personal estate.”
In the case of Pierce v. Trigg, 10 Leigh, 406, Judge Tucker says: “ It has been a vexed question in England, whether the interest oí the deceased partner in the real estate, and the proceeds of the sale-of that interest, belong to the personal representative or to the heir. The better opinion gives the fund to the former, since, upon familiar principles, as the land was purchased with the personalty and was brought into the firm as stock, it ought, as between the executor and the heir, to replace the fund withdrawn from the personal estate. By placing it as stock in the partnership fund, the deceased evinced a design to treat it as personalty, and it ought to go accordingly. The representatives of the deceased can claim it only as stock, and as stock in trade it is, ex vi termini, personal.”
The point has arisen several times in our own court, either directly or incidentally. Green v. Green, 1 Ohio, 135; Green v. Graham, 5 Ohio, 160. In this latter case, the court .seems to consider that where land was bought with partnership funds, the partners took as tenants in common; and if one partner died, his share would descend to Ms heirs.
The cases are numerous in which it has been held that real estate purchased with partnership funds and used as partnership property, descends to the heir, subject to the partnership debts.
Indeed, in all cases cited, the property was so purchased, and was either incident to or necessary in carrying on the partnership concern; and there was no express agreement that the real estate should be considered personal property and be disposed of accordingly.
In the case now under consideration, however, the entries were not made with partnership funds, nor were the lands to be used as a means of carrying on any partnership business other than the purchase and sale of real estate. It is very clear that, although the land was not purchased with partnership funds, but *was to be pmchased with the separate funds of Cooper and Ludlow in equal portions, the property was to be considered partnership property, so far as real estate could be so considered and treated; that it was, by the agreement, to be sold, and converted into money, and each partner to share and share alike in the profits, and, of course, to share in the losses. It is the very case put in Story, above cited, in which he says, in substance, that such real estate will, to all in *10 tents and purposes, be deemed personal property, if tbe parties themselves have by their agreement impressed upon it the character of personalty.'
The language of the agreement in this case is: “ The parties are to be equal in all payments toward the purchase money, as also in the profits or proceeds of the sale of said lands, or any part of them.” Taking this whole agreement together, there can be but little doubt but that the partners intended that this property should be sold as partnership property, and thereby converted, out and out, into personalty, and that either the surviving partner or the present representatives of the deceased partner could, in a court of equity, have compelled a sale and division of the profits. If so, it belonged in equity to the administrators of 'Ludlow, and not his heirs. But, if this should be carrying the principle too far, there is still less doubt that this land must be considered partnership stock or property, so far as to be held liable to the payment of partnership debts as well as the debts which, in settlement of the accounts between the partners, may be found due to either. Whether, therefore, by this particular agreement, the property is to be regarded as personal property passing to the administrator or passing to the heir, subject to the payment of debts and settlement of the partnership accounts, in either case the settlement of that account is a matter between the surviving partner and the administrator of the deceased partner, and the interest, if any, which the heir takes, is subject to that settlement. The settlement of the account is devolved upon the administrator and not the heir. In the case of lands held in ^common, at law, the several interests of the owners are definite and ascertained; in the case of partnership property, the several share of each partner is the residue of interest after the debts of the firm are paid, and the claims of the other partner are satisfied ; but this doctrine does not apply to partnerships in real estate, where, by the express agreement of the parties, the land is to be converted into personalty, and the share which each party is to receive is to be ascertained from the amount of money for which the land shall be sold. And although the legal title may be vested in one or more of the parties,' still a court of equity will consider the property to be what the parties themselves agreed it should be, and will enforce that agreement.
And here the question is presented, whether the contract of 1803 was ever rescinded or honestly understood by Cooper to be rescinded. *11 "Upon this subject one of the counsel for complainants, in his argument, says: “ It will not be pretended, I presume, that there is any evidence tending to prove an agreement between the parties to the •contract, or their representatives, to rescind it. There is not, surely, any such evidence in the case — nothing that looks like it — at least, nothing beyond the letter of Cooper to Findlay, in-1806, in which he proposes to pay the estate $2,000, as a consideration, if the estate will agree to rescind the contract. There is not a particle of evidence to prove that this offer was entertained or accepted, and no circumstance exists from which its acceptance may be inferred. No credit is given by Findlay, in his account as administrator, for the $2,000, or any other sum, as having been received by him from this source, which ought to have been and no doubt would have been given, had any such payment ever been made. The fact that no such entry is found in the account, is pregnant evidence that the proposition was not accepted. Notwithstanding all this, the court, in the reported decision of the original case, assume and find that there must have been an agreement of rescission between Findlay, the administrator, and Cooper. It is almost too obvious that this conclusion of the court is unwarranted. It is ever to be regretted, *that in the grave decisions of our courts of final resort, such gross inaccuracy in matters of fact may be traced ; and such laxity be found to-exist in the application of legal principles as is manifest in reviewing the reported opinion in this case.”
The letter of Cooper to Findlay, one of the administrators of the ■estate of Ludlow, referred to in the argument of counsel, is dated in 1804 or 1806, probably in the latter year, and was brought into this case as evidence by the complainants. On the outside, it is addressed to James Findlay, and at the conclusion of the letter, “ the administrators.” So much of this letter as relates to this ■case, is in these words : “ I expected when Mr. Ludlow returned, he would have brought the certificates with him, but as he did not, I conclude that you and the rest of the administrators have thought best to relinquish the agreement made by Col. Ludlow and myself, respecting the former certificates and the town of Dayton, which I am perfectly agreed to, or I will give the estate $2,000 for the certificates, and to relinquish the agreement; but not my •claim against the company for the former certificates or their value, I will be down in a few weeks, and arrange my affairs with the •estate.” The Ludlow whose name is mentioned in this letter, we *12 understand not to be tbe Ludlow who was one of the administrators of the estate. At the date of this letter, a brother of Ludlow deceased, Eindlay, and Mrs. Ludlow were the administrators of the estate of Ludlow. The heirs at law were all minors.
If we look at this letter without any preconceived opinions, we can not fail to see that the contract upon which the original bill in this case is predicated had been the subject of conversation between Cooper and Eindlay; that the agreement here referred to is the same agreement executed by Ludlow and Cooper; and that some propositions had been made by one to the other as to the terms upon which that agreement might bo rescinded or relinquished on the part of the estate of Ludlow. That there were in the hands of the administrators some certificates *which Cooper desired to have; that he expected when young Mr. Ludlow came from Cincinnati, the place where the administrators resided, he would have brought these-certificates with him — “Cooper expected he would have brought them;” that these certificates were not brought; and for that very reason Cooper came to the conclusion that the administrators had thought best to relinquish the agreement, respecting the former certificates and the town of Dayton, and to which relinquishment Cooper was perfectly agreed. Or ho was willing to pay the estate $2,000 for the certificates, and to relinquish the agreement, but was not willing to relinquish his claim for former certificates or their value. Erom this letter, the counsel for complainants claims that Cooper proposed to pay $2,000 to the estate as a consideration to relinquish this contract, and one reason assigned why the contract could not have been rescinded is, that no credit is given by Eindlay for the $2,000, or any other sum in his account as administrator of the estate of Ludlow as having been received from that source. If the contract was, in fact, rescinded upon the terms proposed by Cooper in his .letter to Eindlay, no-such account ought to have been found; for the very obvious reason that Cooper did1 not in his letter offer to pay the estate anything to-rescind or relinquish the contract. If certain certificates which Cooper expected Eindlay would send to him had been forwarded, then some arrangement or proposition which had been previously made would have been carried out; but as they were not sent,. Cooper came to the conclusion that the administrators had thought it best to relinquish the contract, and with which Cooper was- satisfied; or, Cooper proposed to give $2,000 to the estate for the certifi *13, 14 cates, and to relinquish the agreement. It was for the certificates, he proposed to give the $2,000. He expected the certificates, bnt as they had not come, he was satisfied that the contract should be considered rescinded. We think this letter admits of no other fail-reading. What these certificates were, or for what payments in land given, does *not very clearly appear; but we understand this letter to say, I will give you $2,000 for the certificates,, or if you keep the certificates, I am satisfied to consider the contract at an end, and do now so consider it.
There is no evidence in the case which satisfies this court, or-which ought to have satisfied the Supreme Court making the decree-sought to be reversed, that Cooper ever sought to conceal the existence of this contract -from the administrators or heirs of Ludlow. The contract itself was in the possession of Ludlow; it was, according to the claim of complainants, at a late day, found amongst his-papers. Cooper understood that the administrators knew of its existence, when he says to Eindlay, “ I conclude that you and the rest of the administrators have thought best to relinquish the agreement.” Cooper, in the very nature of things, must have supposed that they knew of the existence of a contract then, in all probability,, in their possession. There is evidence, under Cooper’s own signature, that he did not desire that Mr. Dayton, then of New Jersey, should know that Ludlow and Cooper had made the agreement. He says, in his letter to Findlay, dated on the same day on which he writes to Dayton, that “ for certain reasons I would thank you not to make known to Mr. Dayton that I have given to Col. Ludlow any writing respecting the town of Dayton.” These two letters are-both dated February 23,1804- — a short time after the death of Ludlow; but still, if we consider the other evidence in the case tending-to prove that Dayton expected at least to be, if he was not in fact, interested in the town of Dayton, there arises a very fair presumption that Cooper and Ludlow were both connected in the scheme of keeping from the knowledge of Dayton the existence of this last, written contract: and before the death of Ludlow, it is clear that. Cooper had no interest in keejfing the fact from Dayton except for-the benefit of Ludlow; because at that time there was neither motive-nor interest in Cooper, on his own account,, to do so, if it were true, in fact, that Cooper took one-half of the interest *in the land, and Ludlow the other, upon the principle claimed — that is, that. Ludlow really had but one-fourth, and Dayton the other. It would; *15 not be easy to see wbat difference is made to Cooper, whether Ludlow held the half in his own right or in his own and that of Dayton. ' The probability is, that the suggestion of keeping this written contract from the knowledge of Dayton came originally from Ludlow. He had some interest in doing so; Cooper had not. So far as we ■can see, Cooper, before the death of Ludlow, had no interest in secreting, on his own account, this contract from Dayton.
But did Cooper intentionally conceal, or make use of any means to ■conceal, the existence of this written contract, from either of the administrators of Ludlow, or from the guardians of the minor children? We have no evidence whatever that he did any such thing, .and surely we are not permitted to make any such presumption from the mere fact that he, or he and his partner Ludlow, thought it best not to let Dayton know that a written contract had been made by Cooper and Ludlow.
The court in bank, we think, might fairly infer from the evidence, that Cooper never intended nor attempted to conceal from the administrators or heirs of Ludlow the existence of a written contract, not in the possession of Cooper, but in the possession of Ludlow;— the latter having it at the time of his death- — and which must have been known to the administrators, or at least may be fairly presumed to be in their knowledge or possession, more especially so when Cooper, in his letter to Findlay, expressly refers to this written agreement.
So, also, that court (notwithstanding the fact that the written agreement was found among the papers of Ludlow, after the decease ■of Cooper, and not lifted by him) might, with good reason, find that the contract, as between the administrators of Ludlow and Cooper, was rescinded and put an end to, and that Cooper so considered it when he said to the administrators. in writing: “ I conclude that you and the rest of the administrators have thought *best to relinquish the agreement made by Col. Ludlow and myself respecting the former certificates and the town of Dayton, which I am perfectly agreed to.” When we consider that this letter was written in the year 1804 or 1806 (and Burnet, who proves the handwriting of Cooper, says the letter bears date in 1804) ; that there was plenty ■ of other good land to enter at .the same price in Ohio; that those lands had not been paid for to the general government; that Ludlow had paid nothing to Cooper; that the estate of Ludlow was embarrassed for that the whole of the lands taken *16 or might not turn out to be a profitable investment; it is not by any means an improbable conclusion, that the administrators of Ludlow would think best to surrender the whole to Cooper and relinqtpsh the contract. That the court in bank might fairly find, that up to this time, Ludlow had paid nothing, we think not an unreasonable conclusion. At any rate, we do not see that we'would be justified in saying that the court in bank, from the evidence before that court, erred in any of these findings.
If that court was right in these findings, and' if the true construction of the contract between Ludlow and Cooper was that the property was to be considered as between them personally, and the same was to be sold and converted into money, and the proceeds of sales, and not the lands itself, be divided between the parties, it was in equity, to all intents, and purposes, personalty, and passed to the administrators and not the heirs, and the administrators alone had the right to settle with Cooper; and having, according to the finding of the court in bank, made that settlement, the heirs have no right to make any claim on Cooper or his representatives, and the court in bank was right in dismissing the bill.
And if the court in bank had a right to consider the land as - partnership property and personalty, it makes no difference-whether a settlement of the matter took place or not; for the complainants would have no right, as heirs, and could not have • ^sustained the original bill, and the administrators would have been barred by lapse of time, from sustaining any action.
And, although I am well satisfied, as at present advised, that such is the law of this ease, and that in this country it ought to ■ be so held, especially where the certificates of purchase and partial payment, issued by general government, for land, were considered and transferred as personal property, passing by assignment from hand to hand, and the patents issued to-and in the-name of the assignees; yet, inasmuch as the court in bank did not put the case on that ground, nor was the point distinctly made by counsel, either on the hearing of the original bill or bill of review, we would not feel at liberty to place the case upon that gound alone, without notifying counsel that they might have an opportunity of being heard upon the question.
In the case in 3 Howard, 411, referred to in the argument of one of the counsel for the heirs of Ludlow, the question whether- *17 ■such property was personal or real, was made and argued in favor ■of the proposition that it was personal, by two of the counsel now -on ojjposite sides, but in that case on the same side of the case. This is still an additional reason why we should not put this case upon the ground that the interest of the parties in this land was, by the agreement, converted out and out into personal property, without first notifying the counsel that argument would be heard ■on this point.
It is, however, a very clear proposition, that this property, even if the patents had been issued to Ludlow and Cooper in their lifetime, would in equity be considered personal, so far as the partnership debts, due either to strangers or one of the partners, were •concerned; and that if it descended to the heirs, it would pass subject to these debts, and that the settlement of the accounts between the pai'tners, would be between the survivor and the administrator •of the deceased partner, and not the heir. It is also law in Ohio, ■that where the contract for a conveyance is executory, and the legal title to the property has not passed, *the administrator •of the deceased party possesses the power to compromise'and rescind the contract, where it may be reasonably considered for the inter•est of the estate to make such compromise; and a court of equity will uphold such settlement against the claim of the heir at law.
Vide Howard v. Babcock, 7 Ohio, 72.
Although the article of agreement contains words of a present .grant, yet, in order to construe the instrument, we must look at the situation of the property as well as other parts of the agreement. The title was in the general government, and no patent could issue until full payment was made; if such payment was not made, all claim to the title would be forfeited. Ludlow agreed to pay one-half of the purchase money not yet paid, as well as half of what had already been advanced by Cooper. If Ludlow and Cooper were still living, and the whole of the money had been paid by Cooper, and a patent issued in his name, could Ludlow file a bill in equity and compel Cooper to convey the undivided half to him, without averring either payment or readiness to pay on his part ? Would a court of equity so construe the contract, as to require Cooper to take the title from the United States to himself and Ludlow, whether Ludlow had ever paid one cent toward purchasing the property or not? Can it be that the covenants on the part of Ludlow and Cooper are wholly independent; that Cooper must take *18 the title out in the name of Ludlow, or if taken in the name of •Cooper, that he must convey to Ludlow, and look to his covenant alone to compel Ludlow to make payment? We think that such is not the true construction of the agreement. In contracts for the conveyance of real estate, the language must be very clear indeed, if a court will compel a specific performance and conveyance of the land, without either a performance, or an offer to perform, the covenants on the other side. Courts incline to construe, wherever it can be done, such covenants to be at least mutual, and to' be performed at the same time. It is indeed argued with much force, that, in this case, *Cooper had the inchoate legal title, and by this contract he made Ludlow a joint owner of that title — not an agreement to convey, but an actual conveyance. This may possibly be so; but still the title itself being inchoate in Cooper, his right to the patent depended on his payment of the purchase money to the United States: and such payment was a condition precedent to his right to the legal title, or indeed to any title at all. Ludlow, by his contract with Cooper, was placed in no better situation than Cooper himself; and if ever he acquired the legal title, it would be upon the same terms upon which Cooper acquired title, namely, by payment of his proportion of the purchase money. We think that, as between Cooper and Ludlow, on the one part, and the United States on the other, the contract was executory, and depended entirely for its completion on payment being made to the general gov•ernment; that, as between Cooper and Ludlow, Ludlow was in no better situation than Cooper, and that his right to the legal title to the land depended on the performance of the contract on his part, viz., the payment of half the first installment, and half of each of the other three as they fell due, to the general government ; that the contract was executory, so far as vesting title in Ludlow was concerned, and that he substantially stood, in relation to Cooper, in the same situation that he would have stood, if the legal title at the time of the contract had been vested in Cooper, and Cooper had agreed to convey to Ludlow the undivided half of this land, upon making the payments mentioned in the contract.
If we are right in this construction of the contract, and if the administrators of Ludlow and Cooper did in fact agree to rescind the contract and retain the certificates; and if, in making this rescission, the administrators acted n good faith, and had reasonable grounds for supposing it was best for the estate of Ludlow.to do so, *19, 20 then, according to the decision in Howard v. Babcock, 7 Ohio, 72, a court of equity will not interfere to set aside such contract; nor will it in any manner aid the heirs in enforcing *a specific-performance and compelling a conveyance of the land, no matter-how valuable this land, after a lapse of thirty years, may have become. Dayton in 1803, was not the Dayton of 1836 ; and no man could with any degree of certainty foresee what Dayton would be-in twenty, thirty, or forty years after the contract was made.
The administrators of Ludlow, in 1804 or 1806, may well have supposed it would be better for the estate of Ludlow to hold on to-the land to which he had title, rather than to sell it for the purpose of acquiring title to other lands. There is no pretense that, in 1804, or even in 1806, Cooper had sold for cash enough of the land to pay out the balance; and it was impossible to say at that time that Congress would extend the time of payment until 1813, even by paying interest on the back installments, as the law afterward required. We can not say at this period what at that time ought to have been considered best for the interest of the estate of Ludlow. We do not know whether it might not, at that time, have been necessary to sell, for the payment of these installments, land of much more value than then land about Dayton was considered to be.
That the administrators of Ludlow (or at least Findlay) had conversed about settling this affair, we have no doubt; and that he supposed he had power to do so, we have as little doubt. If he, as well as the other administrators, had not considered the affair settled, in all probability wo should have heard more about the matter before the death of Findlay.
Upon the whole, therefore, we think that Findlay at least (if not the other administrators) as wel as Cooper, considered the whole-affair settled and ended, with which Cooper was well satisfied; and that the administrators did not sell to him the certificates for the $2,000, but retained them; and that nothing more was considered necessary to be done by the parties. Cooper was to pay for and keep the land.
Acting upon the supposition that the affair was settled, Cooper acquired the legal title, paid taxes, sold lots, made donations, and *in various ways spent his time and money to build up the town of Dayton. He kept no account, so far as we know, and for *20 the very reason that lie considered the land his own. "We see no evidence of any attempt on the part of Cooper to act unfairly with either the administrators or heirs of Ludlow, or to conceal the contract from either the administrators or heirs of Ludlow. The purchase turned out to be a profitable one; but, according to the finding of the Supreme Court in bank, Ludlow had paid no. money, in fact, until the time of the rescission of the contract by Cooper and the administrators of Ludlow.
Upon the whole, we can not say that the court in bank erred in its finding of the facts, upon which the bill ought to have been dismissed.
As to the newly discovered evidence, it would scarcely be contended that it ought or could have any bearing on the case, even if competent evidence, if the court had found that the administrators and Ludlow had settled the matter, and surrendered the right of the estate to any interest in the contract.
Upon the whole, therefore, a majority of the court is of opinion:
1. That the newly discovered evidence, even if competent, could not and ought not to change the decree.
2. That the court in bank was justified by the evidence before that court, in finding the fact, that the administrators of Ludlow and Cooper, so far as they could do so, rescinded the contract.
3. That, at the time of the rescission, the administrators might with good reason have considered the settlement to be for the benefit of the estate and heirs.
4. That under such circumstances, after a great lapse of time, a court of equity ought not to interfere in aid of the heir at law, especially if there was neither fraud nor unfairness on the part of Cooper. That there is no evidence of any design on the part of Cooper to conceal the existence of this contract from' either the heirs or administrators of Cooper.
Bartley, J., dissented.